UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DEREK M. WARD,                                   Case No. 2:20-cv-00105

      Plaintiff,                             Hon.  Paul L. Maloney
                                                 U.S. District Judge

  v.

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

On November 21, 2017, Plaintiff Derek M. Ward applied for Supplemental Security Income (SSI) benefits alleging that his disability began on November 2, 2014.  (ECF No. 11-5, PageID.186.)  Ward suffers from bipolar affective disorder and schizoaffective disorder.  The Social Security Administration denied Ward's application (ECF No. 11-4, PageID.108-112) and Ward requested a hearing before an Administrative Law Judge (ALJ).  (*Id*., PageID.116-118 .)  ALJ Peter Kafkas held an initial hearing on January 11, 2019, but he adjourned the hearing so Ward could retain a representative.  (ECF No. 11-2, PageID.77-93.)  Ward did not obtain representation and on June 3, 2019, ALJ Kafkas conducted a hearing.  (*Id*., PageID.59-76.)  Then, on July 15, 2019, ALJ Kafkas issued a decision ruling that

Ward was not under a disability from the alleged onset date through the date of decision. (*Id.*, PageID.44-54.)

Ward now appeals Judge Kafkas's decision. (ECF No. 1, PageID.1.) He argues that the ALJ made several errors. Ward argues (1) that the ALJ erred by failing to fully develop the record because he owed Ward, who was unrepresented, a special duty, (2) that the ALJ erred in finding that Ward did not meet or equal Listings 12.03 (Schizophrenia Spectrum and Other Psychotic Disorder) and 12.04 (Depressive, Bipolar and Related Disorders), and (3) that the ALJ erred in determining Ward's residual functional capacity (RFC) by concluding that he can engage in substantial gainful activity.

In the opinion of the undersigned, the ALJ failed to fully develop the record to address Ward's significant mental health condition. The development of the record was especially crucial in this case because of the fact that Ward was under court petition for mental health treatment at the time of the hearing. The record establishes that Ward lacked insight and judgment regarding his mental health issues and his need for psychological treatment and medication. The record regarding whether Ward will continue to take his medication and whether he can function outside of his family environment was not fully developed and substantial evidence does not exist to support the ALJ's decision denying Ward's application for SSI.

It is respectfully recommended that the Court reverse the decision of the ALJ and remand this matter to the commissioner for further proceedings.

## II.    Summary of Plaintiff's Background and Medical Care

On September 4, 2015, at age 19, Ward was evaluated by Dr. Daniel Tezlaff, J.D., Psy.D. and Dr. Robert Devers, Ph.D.  (ECF No. 11-9, PageID.410-419.)  Ward reported that he was diagnosed with ADD and bipolar disorder.  (*Id.*, PageID.412.) Ward stated he smoked marijuana daily and drank a couple of beers on the weekends. (*Id.*)  Ward appeared at the interview in a good mood and without hygiene or grooming issues.  (*Id.*, PageID.413.)  Ward was well oriented to person, time, and situation, and his speech was unremarkable.  (*Id.*)  Ward exhibited tangential and loose thought processes by switching among unrelated topics but was overall goal-directed. (*Id.*)  Ward reported significant memory problems, but none were exhibited during the evaluation.  (*Id.*)  The psychologists found that Ward fell in the low average to average range of functioning, but Ward had expressed some bizarre and delusional beliefs in telepathy, thought insertion, and other magical beliefs.  (*Id.*, PageID.418.)

Although Ward's expressed beliefs were not harmful, they made it difficult at times to relate and communicate with Ward.  (*Id.*)  The psychologists found that Ward was a good candidate for vocational training/rehabilitation services, but concluded that it was unlikely that he would be successful in an independent learning environment outside his local area.  (*Id.*)  The psychologists opined that Ward, who lacked family support, insight, judgment and coping skills, would decompensate.  (*Id.*, PageID.418-419.)  The prognosis was guarded with recommendations to follow-up

with a primary care provider and engage in individual outpatient counseling.  (*Id.*, PageID.419.)

Ward's parents brought him to the Chippewa County's War Memorial Hospital Emergency Department on November 9, 2016, after Ward did not take his medication for one week.  (*Id.*, PageID.425.)  Ward showed flight of ideas, magical thinking, and delusional behavior.  (*Id.*)  Ward stated that he was happy and saw the bright side of things while living in a parallel universe.  (*Id.*)  Ward stated he was a naturalist who did not like to take medications.  (*Id.*)  He presented as disheveled, with dry lips and an odor of urine.  (*Id.*)  Ward refused an antibiotic for a urine infection despite being told he could get very ill and possibly die without treatment, and he refused a potassium pill to help elevate his low potassium.  (*Id.*, PageID.430.)  He was petitioned by Dr. Michael E. Oates, M.D., and Wendy Jamros, RNS, MS, FNP, and transferred to the hospital's psychiatric facility in stable condition.  (*Id.*, PageID.430-431.)

Ward was discharged from the hospital on November 21, 2016.  (*Id.*, PageID.434.)  His discharge summary indicated his referral was due to increasing manic and psychotic behavior.  (*Id.*)  He had delusions that he was God and had influence over people.  (*Id.*)  He had poor hygiene and was not showering or sleeping.  (*Id.*)  He was prescribed Zyprexa and Fluticasone but refused Zyprexa for several weeks.[1]  (*Id.*)  During a previous hospitalization in 2014, he was diagnosed with

---

[1]    Zyprexa is used to treat mental conditions such as schizophrenia and bipolar disorder.  (Zyprexa Oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing – WebMD.)  Fluticasone is a nasal spray used to reduce inflammation.

bipolar disorder.  (*Id.*)    Ward refused to take medication – Zyprexa – until he appeared before a judge.  (*Id.*, PageID.435.)  Once he began taking his medication and a mood stabilizer, his behavior improved, and he became more cooperative and more friendly.  (*Id.*)  He was calm, and not delusional or suicidal.  (*Id.*)  Ward's prognosis was fair because of his tendency to refuse medication.  (*Id.*)

At his first post-hospitalization office visit on December 12, 2016, Ward reported that he was doing well and had no symptoms.  (*Id.*, PageID.448.)  The doctor noted that Ward had said he was doing well throughout his hospitalization, although that was not the case.  (*Id.*)  His mother reported that he was doing better and was not showing any bizarre behaviors.  (*Id.*)  He will continue to take Zyprexa but he stopped taking Tegretol shortly after his hospitalization because he felt he did not need it.  (*Id.*)  The doctor indicated that he would not insist that Ward continue to take Tegretol.[2]  (*Id.*)

Ward had a psychiatric evaluation at Hiawatha Behavioral Health on January 6, 2017.  (ECF No. 11-10, PageID.490.)  The provider expressed concern that he was not taking Tegretol and wanted to increase the Zyprexa dosage, but Ward declined.  (*Id.*, PageID.494.)  Medication compliance was explained, and it was noted that Ward's prognosis regarding symptom control was guarded.  (*Id.*)  At his February 3, 2017 visit, Ward was doing well, and his mother concurred.  (*Id.*, PageID.489.)   It

---

(Fluticasone Propionate Nasal: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing – WebMD.)

[2]    Tegretol is used to treat symptoms of epilepsy, nerve pain, and bipolar mania.  (Tegretol (Carbamazepine): Uses, Dosage, Side Effects, Interactions, Warning (rxlist.com).)

was noted that his marijuana use complicates his diagnosis (*id*., PageID.488), although Ward denied recent use and indicated he was avoiding it because he got into trouble with the law (*id*., PageID.485).  Ward made a visit for a medication review on April 6, 2017, and reportedly was doing very well – both he and his mother had no concerns.  (*Id*., PageID.482.)  No changes were ordered but it was noted that his insight and judgment were poor to fair.  (*Id*.)  It was also noted that his willingness to take his medication had been helpful and that he should continue to avoid using substances.  (*Id*., PageID.482.)  At his May 30, 2017 visit, Ward stated that "I don't know if I need the medication, I think it keeps me separated from my true self."  (*Id*., PageID.475.)  Ward also indicated that he did not believe that he was bipolar or manic and only took his medications to please his mother.  (*Id*.)  Dr. David P. Meeker, D.O., recommended that he continue taking Zyprexa.  (*Id*.)

Ward scheduled a June 15, 2017 visit, after his family reported that he had increased manic symptoms and behaviors such as showering in his clothes.  (*Id*., PageID.468.)  Dr. Meeker noted that Ward lacked insight and judgment regarding his illness and assessed him with bipolar disorder I, most recent episode manic, with psychotic features.  (*Id*.)  Dr. Meeker believed that although Ward was taking Zyprexa, a different medication could be beneficial.  (*Id*., PageID.473.)  Dr. Meeker advised testing to determine if a different medication would be helpful.  (*Id*.)

On August 8, 2017, Dr. Meeker determined that, given Ward's willingness to take Zyprexa, no change to his medication would be made.  (*Id*., PageID.467.)  By November 22, 2017, Ward reported that he was taking his medication, was down from

over 200 pounds to 187 pounds due to diet and exercise, and his mood was stable. (*Id.*, PageID.461.)  Ward also stated that he had applied for disability because he could not maintain a job – "they just have a problem with me." (*Id.*)  Dr Meeker noted that Ward's medication was having a calming effect, and Ward appeared somewhat stable. (*Id.*)

On January 16, 2018, Dr. Meeker expressed concerns about Ward losing weight and his eating patterns. (*Id.*, PageID.458.)  Ward's weight was 184 pounds and Ward stated he just wanted to lose weight. (*Id.*)  Ward stated he applied for disability benefits because "it's easy money and it allows me to do things I wanna do." (*Id.*) At his March 20, 2018 visit, Dr. Meeker noted that Ward appeared stable. (ECF No. 11-11, PageID.534.)

Once again, Ward's stable condition would change due to his failure to recognize his illness and his need to continue to take his medication.

Ward was involuntarily hospitalized by a court order due to increasingly odd behaviors and was provided inpatient treatment between September 19, 2018, and October 19, 2018. (*Id.*, PageID.551.)  Ward was living at home with his parents and became increasingly disorganized, stayed up late, and did not take care of himself. (*Id.*)  Ward was not eating and had lost 25 pounds over the course of a few weeks. (*Id.*)  Ward exhibited grandiose and delusional behaviors. (*Id.*)  He stated he was making money through a "holographic network" called the "Holonet" where he created an infinite number of movies. (*Id.*)  He stated that "I believe I am the source of creation." (*Id.*)   Ward was refusing to take his medication and he was making

7

threats toward his parents.  (*Id*.)  Ward was given Invega, an injectable medication, after his continuing refusal to take Zypreza.[3]  (*Id*., PageID.552.)  When he failed to show appropriate improvement, the mediation Depakote was added.  (*Id*.)  Ward was resistant to the new medications and did not understand why he needed them.  (*Id*.)  After he received the Depakote medication, his mood stabilized, and he was cooperative and not demonstrating grandiosity or delusions.[4]  (*Id*.)

Ward denied all psychiatric symptoms at his discharge on October 19, 2018, but stated that he would continue to take his medications.  (*Id*., PageID.553.)  Ward demonstrated a fair level of improvement, demonstrated mood stabilization, increased cooperation, and decreased agitation while medicated.  (*Id*.)  His prognosis was fair, and it was noted that a failure to take his medication, engage in therapy, avoid substance abuse and interpersonal conflict might worsen his prognosis.  (*Id*., PageID.554.)  His final diagnosis was schizoaffective disorder, bipolar type.  (Id., PageID.555.)

On October 29, 2018, Ward stated that "there's nothing wrong with me."  (*Id*. PageID.531.)  Dr. Meeker noted that Ward had been non-compliant with his medications and had missed appointments since March of 2018.  (*Id*.)

---

[3]    Invega is used to treat mood disorders such as schizophrenia and schizoaffective disorder.  (Invega oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing – WebMD.)

[4]    Depakote is used to treat seizure disorder and psychiatric conditions such as the manic phase of bipolar disorder.  (Depakote Oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing - WebMD.)

Dr. Meeker, on November 27, 2018, noted Ward's history of poor compliance with medication, multiple inpatient hospitalizations, lack of insight and judgment regarding his illness and the need for treatment.  (*Id*., PageID.528.)  At his January 3, 2019 visit, Dr. Meeker continued Ward on his medications.  (*Id*., PageID.525.)

Ward, who was unrepresented, initially appeared by video conference before the ALJ on January 11, 2019.  (ECF No. 11-2, PageID.77-93.)  Ward asked if his mother could help during the hearing.  (*Id*., PageID.81.)  ALJ Kafkas stated that he would allow Ward's mother to represent him, but she could not testify on his behalf *and* represent him.  (*Id*.)  Ward wanted to proceed, but also wanted to talk it over with his mother.  (*Id*., PageID.82.)  He then stated he would proceed without first consulting his mother.  (*Id*., PageID.83.)  The ALJ decided that Ward's mother should be consulted.  (*Id*.)  After some further discussion regarding legal services available, Ward and his mother decided that the hearing should be adjourned to consult attorneys or representatives.  (*Id*., PageID.84-90.)  The ALJ agreed and adjourned the hearing.  (*Id*.)

The ALJ held a short hearing on June 3, 2019.  (*Id*., PageID.59-76.)  The hearing began at 3:56 pm and ended at 4:23 pm.  (*Id*.)[5]  Again, Ward appeared by video conference and was unrepresented.  (*Id*., PageID.61.)  During the second hearing, there was no discussion regarding representation.  (*Id*., PageID.59-76.)  Ward stated he had "bad mental confusion" that made it difficult for him to work.

---

[5]    For comparison, the first hearing, in which the only issue that was discussed was representation, lasted longer.  That hearing started at 1:14 pm and finished at 1:47 pm.  (ECF No. 11-2, PageID.61-93.)

(*Id.*, PageID.62.)  Ward further stated that he has "a lot of ups and downs".  (*Id.* PageID.64.)  Ward said he is okay because he takes medicine, but other days he "can't really deal with" himself.  (*Id.*)  He stated that he does not have much trouble concentrating while at home, but has difficulty concentrating on a job, because he gets yelled at and picked on. (*Id.*, PageID.65.)  Ward stated that his medications help but do not totally take it away.  (*Id.*, PageID.66.)  Ward denied using marijuana regularly and said he only dabbled in it – "once in a blue moon."  (*Id.*, PageID.66-67.) The ALJ asked about chores, which Ward stated he did not do.  The ALJ then asked "[i]s there anything else you want to tell me?"  (*Id.*, PageID.67.)  Ward responded by asking whether the ALJ was going to ask about jobs.  (*Id.*)  The ALJ stated he was going to ask the VE about that.  (*Id.*)  Ward then stated he got fired from every job he had, but quit his last job because it was embarrassing.  (*Id.*, PageID.68.)   He stated that he tries his best but "[t]hey catch on pretty quick."  (*Id.*)   Ward had jobs as a cleaner and fast-food worker.  (*Id.*  at 70.)

The VE testified that an individual of Ward's age, education, and skill set – who was limited to simple instructions, simple and routine tasks, free of fast-paced production, with simple decision making, few if any workplace changes, and occasional interaction with public and coworkers – could perform jobs such as housekeeper/cleaner,  floor waxer, laundry worker, and dietary aid.  (*Id.*, PageID.72-73.)   That same worker with the additional limitation of no interaction with the public could perform the same jobs except the dietary aid position.  (*Id.*, PageID.73.)

The VE testified that if that same individual was off task 25 percent of the time and needed two extra 15-minute breaks per day in addition to regularly scheduled breaks, the additional limitations would be work preclusive. (*Id.*, PageID.74.) The VE testified that no more than one absence per month would be tolerated. (*Id.*) Ward noted that he had been fired from his past cleaning jobs. (*Id.*, PageID.75.)

## IV.    ALJ's Decision

Generally, an ALJ must employ a five-step sequential analysis to determine whether the claimant is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520; *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). At step one, the ALJ determines whether the claimant can still perform substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant's impairments are considered "severe." 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments meet or equal a listing in 20 C.F.R. part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). Before proceeding to step four, the ALJ determines the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e). At step four, the ALJ determines whether the claimant has the RFC to still perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). At step five, after considering the claimant's RFC, age, education, and work experience, the ALJ determines whether a significant number of other jobs exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines the claimant is not disabled under any step,

the analysis ceases and the claimant is declared not disabled.    20 C.F.R §
404.1520(a)(4).

ALJ Kafkas's  eleven-page decision is the focus of this appeal.  In this decision,
ALJ Kafka set forth the five-step sequential process used to determine whether an
individual is disabled.  (ECF No. 11-2, PageID.45-46.)

At step one, the ALJ found that Ward had not engaged in substantial gainful
activity since November 2, 2017.  (*Id.*, PageID.46.)

At step two, the ALJ found that Plaintiff had the severe impairments of
depressive, bipolar, and related disorders.  (*Id.*)

At step three, the ALJ found that Ward did not have an impairment or
combination of impairments that met or medically equaled an impairment listed in
20 C.F.R., Part 404, Subpart P, App'x 1.  (*Id.*)  The ALJ noted that he had considered
and rejected listing 12.04.  The ALJ found that Ward did not meet the paragraph B
criteria by showing at least one extreme or two marked limitations in the areas of
functioning:  understanding, remembering, or applying information, interacting with
others, concentrating, persisting, or maintaining pace, or adapting or managing
himself.  (*Id.*, PageID.46-47.)  The ALJ found that Ward had no more than moderate
limitations in any of the functional domains of the paragraph B criteria when he took
his medications.  (*Id.*, PageID.47.)   The ALJ found that Ward did not satisfy the
paragraph C criteria because there were no detailed findings in the record showing
that a minimal increase in demands or a change in environment would cause
decompensation.  (*Id.*, PageID.48.)

The ALJ then made findings regarding Plaintiff's RFC.  The ALJ stated the following:

> After careful consideration of the entire record, the undersigned find that the claimant has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, routine and repetitive tasks in an environment free of fast-paced production requirements with only simple work-related decisions and few, if any, workplace changes. He is further limited to only occasional interaction with supervisors and coworkers and no interaction with the public.

(*Id*.)

In determining Ward's RFC, the ALJ considered Ward's description of his symptoms.  The ALJ noted that he was utilizing a two-step process to evaluate these symptoms.  First, he considered whether Ward's impairments could reasonably be expected to produce Ward's pain and other symptoms.  And, second, he considered the intensity, persistence and limiting effects of these symptoms to determine the extent to which they limit Ward's functional capabilities.  (*Id*., PageID.49.)

The ALJ outlined Ward's statements from his function report and his mother's third-party function report and concluded that Ward's medically determinable impairments could reasonably be expected to cause his alleged symptoms.  (*Id*., PageID.50.)  But the ALJ found that Ward's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (*Id*.)  The ALJ based his conclusion on his finding that Ward's descriptions of his symptoms was inconsistent with the record.  First, The ALJ noted that Ward graduated from High School with a B average, despite being pulled out of school part of his senior year after he began

13

having delusions and hallucinations.  (*Id*.)  Second, the ALJ pointed to the October 2015 psychological examination conducted by Dr. Daniel Tezlaff, JD, PsyD. and Dr. Robert Devers, PhD.  (*Id*.)  The psychologists concluded that Ward's intellectual abilities fell in the low average to average range of functioning, and he was a good candidate for vocational training.  (*Id*.)  The ALJ found their opinion persuasive because it was substantiated by the record.  (*Id*.)  The ALJ found another portion of their opinion – that it was unlikely that Ward would be successful in a learning environment without the support of family and friends – to be unpersuasive.  (*Id*.)

The ALJ determined that Ward's noncompliance with his medication regimen resulted in his delusional and manic behaviors in November of 2016.  (*Id*.)  During Ward's November of 2016 inpatient treatment, he was diagnosed with bipolar disorder and stabilized while maintaining compliance with his medication schedule. (*Id*., PageID.50-51.)  Ward continued to do well until his September of 2018 episode of erratic behavior.  (*Id*., PageID.51.)  Again, it was determined that he had stopped taking his medication.  (*Id*.)  Ward was admitted for inpatient treatment and court ordered medication compliance.  (*Id*.)  On his discharge he showed fair improvement. (*Id*.)  Finally, during the hearing, Ward testified that he was taking his medication. (*Id*.)  The ALJ noted that he demonstrated appropriate conduct and behavior during the hearing and no evidence of behavioral deficits or delusional or grandiose thinking. (*Id*.)

The ALJ determined that Ward exhibited no more than moderate functional difficulties when he took his medication.  (*Id*.)   The ALJ also noted that Ward had

indicated that he applied for social security benefits because it was easy money and would allow him to do what he would like to do.  (*Id.*)

The ALJ incorporated these moderate difficulties into his RFC by limiting Ward to simple decision-making with few if any workplace changes.  (*Id.*)  The ALJ further addressed social interaction difficulties by limiting Ward to occasional contact with supervisors and coworkers and no interaction with the public and memory difficulties by limiting him to only simple and routine tasks.  (*Id.*, PageID.52.)  The ALJ noted that none of Ward's treating psychiatrists or psychologists set forth any restrictions.  (*Id.*)

The ALJ found that the opinion of State agency psychological consultant, Dr. Mark Garner, PhD., was persuasive.  (*Id.*)  Dr. Garner found that Ward's impairments imposed mild difficulties understanding, remembering, and carrying out instructions, and mild difficulties with his ability to adapt and manage. (*Id.*) Dr. Garner found Ward had moderate difficulties in functional domains of social interaction and maintaining concentration, persistence and pace.  (*Id.*)

Based on the Ward's age, education, work experience and RFC, the ALJ found that jobs existed in the national economy that Ward could perform, such as floor waxer (100,000 jobs), laundry worker (100,000 jobs), and counter supply worker (100,000 jobs).  (*Id.*, PageID.53.)

## V.    Standard of Review

Review of an ALJ's decision is limited to two issues: (1) "whether the ALJ applied the correct legal standards," and (2) "whether the findings of the ALJ are

supported by substantial evidence." *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); 42 U.S.C. § 405(g). The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. 42 U.S.C. § 405(g).

Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever evidence in the record fairly detracts from its weight. *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984) (citations omitted). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).

## VI.    Analysis

Ward first argues that the ALJ failed to fully develop the record.   An ALJ has an obligation to fully develop the record where a claimant is unrepresented and unfamiliar with the hearing procedures.  *Lashley v. Secretary*, 708 F.2d 1048, 1051 (6th Cir. 1983).   The ALJ has a duty to "scrupulously and conscientiously explore all the relevant facts when adjudicating claims brought by an unrepresented claimant." *D'Angelo v. Commissioner*, 475 F. Supp.2d 716, 720 (W.D. Mich. 2007).  However, "the mere fact that a claimant was unrepresented is not grounds for reversal."  *Duncan v. Secretary*, 801 F.2d 847, 856 (6th Cir. 1986).   The reviewing Court must look to the record in each case to determine whether it was fully developed.  (*Id*.)

It is undisputed that Ward was unfamiliar with the hearing process.  During the first hearing, Ward thought that his mother could represent him *and* be a witness on his behalf.   The ALJ informed Ward that he would allow his mother to either represent or him or to be a witness, but she could not do both.   Ward indicated that he wanted to proceed, but the ALJ refused to proceed without first consulting Ward's mother.   Ward's mother determined that Ward should seek representation and then Ward agreed.   The ALJ seemed to recognize that Ward at the very least should not represent himself by consulting Ward's mother about representation.   After consulting Ward's mother, the ALJ determined that the hearing should be adjourned to give Ward time to obtain representation.  (ECF No. 11-2, PageID.77-93.)

Unfortunately, Ward did not have representation at the second hearing and the ALJ never called his mother into the hearing, even as a witness.  The ALJ never

even asked Ward about representation, about his mother, or whether Ward wanted to present any witnesses at the second hearing.

The medical evidence establishes that Ward did not believe that there was anything wrong with him, while Dr. Meeker and other providers noted repeatedly in the medical records that Ward lacked insight and judgment regarding his need for mental health treatment.  (See, e.g., ECF 11-10, PageID.469 ("patient does not believe that he is suffering from any form of mental illness"), 482 ("has very little insight into his mental illness"); ECF 11-11, PageID.528 ("lack of insight and judgment in regards to his illness and the need for treatment"), 531 ("minimizes, or lacks insight regarding" mental health.)  Interestingly, the ALJ stated that none of Ward's treating providers noted any functional limitations.  (ECF No. 11-2, PageID.52.)  This statement simply ignores the basis for Ward's psychological treatment.  First, Ward was unemployed during his treatment periods and vocational functional limitations were not the concern of his treating providers.  Rather, his treatment providers were generally trying to get Ward's mental illness under control through medications, and to educate Ward that he needed to continue to take his medications.  Ward frequently expressed his belief that his medications were unnecessary.

Second, nowhere in the medical record were functional limitations an issue for Dr. Meeker to discuss, or for Ward's treating physicians to discuss.  This was the case while Ward was subject to court-ordered psychological treatment.  Ward was hospitalized between November 9, 2016, and November 21, 2016, after Dr. Oates and Nurse Jamros petitioned him for psychological treatment.  (ECF No. 11-9,

PageID.425-430.)  It was noted in the records that this was the second time Ward was hospitalized.  (*Id.*, PageID.434.)   He was also hospitalized in 2014, for suicidal ideation.  (*Id.*; ECF No. 11-10, PageID.506)  On discharge, Ward's prognosis was fair due to his tendency to refuse to take his medication.  (*Id.*, PageID.435.)   He began treatment with Hiawatha Behavioral Health on December 6, 2016, under a court-imposed 90-day Alternative Treatment Order.  (ECF No. 11-10, PageID.499.)  Ward lacked insight into his mental health, expressed his belief that he did not need treatment, and said that he hated medications.  (*Id.*)  Ward was again hospitalized between September 19, 2018, and October 19, 2018, after he was placed under a court order for psychological treatment.  (ECF No. 11-11, PageID.551.)  Upon discharge, his prognosis was fair if he continued to take his medication, avoided substance abuse, and continued with therapy.  (*Id.*, PageID.553.)  Ward indicated that he would comply with the court order to continue taking his medication for 60 days after discharge, but he was informed that the court order was for more than 60 days.  (ECF No. 11-8, PageID.392.)

Third, although the ALJ noted that Ward was compliant with medications while under court order, he failed to appreciate the fact that Ward was under court orders on at least three occasions for psychological treatment and that he was under a court order for psychiatric treatment and medication at time of the hearing.  (ECF No. 11-7, PageID.289-296.)

The ALJ noted that Ward was functional while under court-ordered monitoring of his medication, which controlled his mental health symptoms.  (ECF No 11-2,

PageID.52.)   This observation fails to account for the fact that Ward frequently decided that he did not need to take his medication and that he failed to comprehend the extent of his mental health issues.  Court-ordered compliance with medications indicates that Ward may not be able to function well without intervention, and that he may not be able to function outside of his family environment.  The ALJ did not explore whether permanent intervention was an option, or even practical.  The ALJ failed to consider the likelihood that Ward would not continue to take his medication, and he had no basis to conclude that Ward would continue to take his medications. The consulting experts did not consider whether Ward would continue to take his medications, but expressed some concerns that he might not.  The record was not fully developed on this issue.

As for the consulting expert opinion of Doctors Tezlaff and Dever's, their opinion was based upon a September 4, 2015, examination, which predates most of Ward's medical records and more recent hospitalizations.  The ALJ determined that the doctors' opinion – that Ward would be unsuccessful outside of his family environment because of lack of insight, judgment, and coping skills – was unpersuasive.  In the opinion of the undersigned this determination was not based upon substantial evidence because it ignored the extensive medical record showing that Ward lacked insight into his mental illness (*see*, *e.g.*, ECF No. 11-9, PageID.418-419 ("He appears at present to lack the insight, judgment, and coping skills required of independent living/learning."), and that he only takes his medications to please his mother (ECF No. 11-10, PageID.475), or while he was under Court order or

20

undergoing inpatient treatment. Ward's medical providers found that he not only lacked insight into the severity of his mental illness, but also that he was frequently non-compliant with his medication regimen, which caused him to decompensate. Nothing in the record establishes that this pattern will not continue.

Finally, the VE testified that if a claimant such as Ward missed more than one scheduled workday per month or needed two extra fifteen-minute breaks per day, he would not be employable. (ECF No. 11-2. PageID.74.) The record shows that it is more likely than not that Ward would on occasion be absent more than one workday per month based on being petitioned and under court order for inpatient psychological care on multiple occasions for extended periods of time.[6]

## V. Recommendation

It is respectfully recommended that the Court reverse the ALJ's decision and remand this matter for further proceedings.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections

---

[6]    Ward argues that he meets or equals listings 12.03 and 12.04. Based upon the current record, the Court cannot agree that Ward meets or equals these listings. The ALJ found that the record does not support a finding that Ward can meet these listings based upon the lack of criteria B marked or extreme finding or lack of a finding that supports that he meets criteria C requirements. The Court would have to speculate based upon an interpretation of the medical records that Ward might meet the criteria. The Court should not do so. If this matter is remanded, the ALJ may seek to expand the record to include more recent consulting opinions and the claimant may seek opinions from his treating providers.

constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).


/s/ *Maarten Vermaat*
Maarten Vermaat
U. S. MAGISTRATE JUDGE

Dated:   February 14, 2022